**E-FILED**
Tuesday, 28 July, 2015  03:26:47 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **KARI J. LAUTERBACH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **12-cv-03228** |
| | ) | |
| **THE ILLINOIS STATE POLICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Now before the Court in this gender–employment discrimination suit is the Motion for Summary Judgment filed by Defendant the Illinois State Police ("ISP") (d/e 14). Plaintiff Kari J. Lauterbach has brought a two-count complaint against ISP alleging two theories of discriminatory pay because her pay as a Senior Public Service Administrator in the ISP's Bureau of Information Services was not commensurate with that of her male colleagues. Count 1 alleges that she was not paid equally for equal work in violation of the Equal Pay Act, 29 U.S.C. § 206(d). Count 2 alleges that ISP discriminated against her on the basis of gender under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

Because each of Lauterbach's claims present genuine issues of material fact concerning the nature of Lauterbach's work and the application of ISP's merit compensation system, ISP's Motion for Summary Judgment is DENIED.

## I.  BACKGROUND

In 1979, Kari Lauterbach completed her Associate Degree of Applied Science in data processing at Lakeland College and began working for the Illinois State Police in the entry-level position of Programmer I.  Her starting salary was $1,048 per month.  Over the course of her career with ISP, Lauterbach received four promotions: to Programmer II in October 1980; to Programmer III in July 1982; to Programmer IV in August 1985; and to Information Systems Executive 2 in April 1988.  In August 1993, Lauterbach's position changed classifications to Senior Public Service Administrator (SPSA), a broad-banded employee class comprising several layers of "code," or non-law-enforcement, management within ISP.  As code employees, Lauterbach and her colleagues were subject to a merit compensation system governed by the Illinois Personnel Code, 20 ILCS 415/1 et seq., and the Illinois Department of Central Management Services' Personnel Rules and Pay Plan, 80 Ill. Admin.

Code §§ 301–05, 310, & 320, et seq.  The merit compensation system provided pay increases including lockstep pay increases by classification, merit-based salary increases, and discretionary increases.  Discretionary increases include salary adjustments for additional responsibilities and "special" salary adjustments to serve the best interest of the ISP.

Three layers of management fell within the SPSA classification: bureau chiefs, who reported directly to ranking law-enforcement management of the bureaus' respective divisions; assistant bureau chiefs who reported to the bureau chiefs; and section managers who reported to assistant bureau chiefs.  As an SPSA, Lauterbach herself held several different job titles and roles in the management hierarchy between 1993 and her retirement in 2012.  She first became a section manager in 1993.  In October 2006, she became an interim assistant bureau chief while her bureau chief, Steve Bova, was out for three months to attend command college training, and an assistant bureau chief, Steve Nation, became the interim bureau chief.  While interim assistant bureau chief, Lauterbach also retained all her responsibilities as a section manager.  Upon Bova's return, Lauterbach briefly reverted to section manager only

to return to the position of interim assistant bureau chief when Bova left the Bureau of Information Services for good in February 2007. She continued in her duties as both interim assistant bureau chief and section manager until January 2008, when she became interim bureau chief upon Nation's departure. She reverted to interim assistant bureau chief in March 2008 upon the hiring of Jamie Blakley as bureau chief, and she remained in that role until her retirement in 2012. Notably, each of Lauterbach's positions— section manager, assistant bureau chief, and bureau chief, as well as interim positions—was classified as an SPSA. Lauterbach describes the people holding positions under the broad-banded employee class of SPSA as "supervisors, managers of sections with a different number of employees reporting to each of us." (Def.'s Mem. Law Supp. Def.'s Mot. Summ. J. [hereinafter "Def.'s Mem. Summ. J."], d/e 15, Ex. 1, at 13.) Although on at least two occasions Lauterbach requested command college training like that which her male colleagues had received, she was turned down because she was told that she could not be gone from the Bureau of Information Services for three months at a time.

Through several ISP administrative reorganizations, Lauterbach's position was switched to the Bureau of Information Services, under the auspices of first the Division of Information Technology Command and then, following a merger with the Bureau of Application Testing and Methodology in approximately June 2009, the Division of Administration.  Starting in the mid-1990s and continuing until her retirement in 2012, Lauterbach identified at least two fellow SPSAs—Jamie Blakley and David Law, both men—who she came to learn earned greater salaries through the merit compensation system even though each of them had at one time held the title of assistant bureau chief or interim assistant bureau chief and, Lauterbach believed, their work was equal to hers.[1]

---

[1] In her Complaint, Lauterbach also identifies Doug Phillips, Cindy Eicher, and Carol Gibbs as fellow SPSAs who performed equal work, and she alleges that Eicher, Gibbs, and she all received pay unequal to that of their male colleagues.  Lauterbach also does not brief significant arguments concerning the equal work of fellow SPSA Ken Loyd, nor the comparative application of the merit compensation system to fellow SPSA Steve Nation.  Because neither Lauterbach nor ISP develops substantial factual comparisons to Phillips, Eicher, Gibbs, Loyd, or Nation in their briefs, the Court joins the parties in focusing its analysis on Blakley and Law.  For similar reasons, the Court also will not address undeveloped

Specifically, Law, who had begun working for ISP in 1976 at a monthly salary of $622, had received eight promotions as well as additional salary increases, including one salary adjustment for additional responsibilities and one "special" salary adjustment, pushing his monthly salary to $8,810 by the time he retired in 2009.  For his part, Blakley had begun working for ISP in 1980 at a monthly salary of $842.  Over the course of his career in the state system, Blakley earned eight promotions as well as additional salary increases, including one salary adjustment for additional responsibilities.  His employment history also included transfers to the Lottery and the Department of Children and Family Services and a stint in private sector employment.  By the time of Lauterbach's retirement in 2012, Blakley earned a monthly salary of $8,335.  Lauterbach herself, despite four promotions and other salary increases, including two salary adjustments for additional responsibilities, earned a monthly salary of only $7,590.

Because of this salary discrepancy with her male colleagues, Lauterbach has brought a two-count complaint against ISP alleging

---

arguments, articulated in the Complaint, concerning the pay of subordinate male employees.

two theories of discriminatory pay.  Count 1 alleges that she was

not paid equally for equal work in violation of the Equal Pay Act, 29

U.S.C. § 206(d).  Count 2 alleges that ISP discriminated against her

on the basis of gender under Title VII of the Civil Rights Act of 1964.

Following ISP's Answer to the Complaint, the parties proceeded

immediately to discovery.  ISP filed the present Motion for Summary

Judgment on October 1, 2014.  Following the Court's denial of

Lauterbach's Motion to Strike an affidavit in support of ISP's Motion

for Summary Judgment, the Court granted the parties additional

time to file any supplemental briefing.  The parties filed no

supplements, and the Motion for Summary Judgment is now fully

briefed and ready for disposition.

## II.   LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper if the moving party shows that

no genuine dispute exists as to any material fact and that the

moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a).  When ruling on a motion for summary judgment, the

Court must consider the facts in the light most favorable to the

nonmoving party, drawing all reasonable inferences in the

nonmoving party's favor.  Woodruff v. Mason, 542 F.3d 545, 550 (7th Cir. 2008).

The moving party bears the initial responsibility of informing the court of the basis for the motion and identifying the evidence the moving party believes demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party."  Brewer v. Bd. of Trs. of the Univ. of Ill., 479 F.3d 908, 915 (7th Cir. 2007).

When the nonmoving party bears the ultimate burden of persuasion on a particular issue, the moving party need only show there is an absence of evidence to support the nonmoving party's case.  Modrowski v. Pigatto, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting Celotex, 477 U.S. at 325).  The nonmoving party must then produce evidence, such as affidavits, depositions, or answers to discovery, to show that there is evidence upon which a jury could find in her favor.  Modrowski, 712 F.3d at 1169 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)).  The nonmoving party cannot rest on the allegations in her complaint but must offer support for those allegations.  See Mosley v. City of Chi., 614 F.3d

391, 400 (7th Cir. 2010).  Moreover, a court may only consider admissible evidence when reviewing a motion for summary judgment.  Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009).

Where the party moving for summary judgment bears the burden of persuasion at trial, however, such as a defendant asserting an affirmative defense, the moving party must establish all the essential elements of that defense with credible evidence that would entitle it to a directed verdict if not controverted at trial. Celotex Corp., 477 U.S. at 331.  This high standard for defendants to obtain summary judgment is applied with added rigor in employment-discrimination cases, where intent and credibility are crucial issues.  Robinson v. PPG Indus., Inc., 23 F.3d 1159, 1162 (7th Cir. 1994) ("[W]e will affirm the decision of the district court [to grant defendant's motion for summary judgment] only if, had the record before that court been the record of a complete trial, the defendant would have been entitled to a directed verdict.").

Generally speaking, a district court is "not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion."  Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 898 (7th Cir. 2003); Greer v. Bd. of Educ. of

Chi., 267 F.3d 723, 727 (7th Cir. 2001) (noting that employment

discrimination cases are fact-intensive and that a court is not

required to scour the record looking for factual disputes).  The court

is only required to consider the material specifically cited to by the

parties, although the court may consider other materials in the

record.  Fed. R. Civ. P. 56(c)(3).

### III.   ANALYSIS

**A.   Lauterbach's prima facie case of gender discrimination and ISP's defenses under the Equal Pay Act present genuine issues of material fact, suitable for a jury to determine.**

The Equal Pay Act provides in part:

> No employer . . . shall discriminate . . . between
> employees on the basis of sex by paying wages to
> employees . . . at a rate less than the rate at which he
> pays wages to employees of the opposite sex . . . for equal
> work on jobs the performance of which requires equal
> skill, effort, and responsibility, and which are performed
> under similar working conditions . . . .

29 U.S.C. § 206(d)(1).  To prove her claim under the Equal Pay Act,

Lauterbach must establish a prima facie case that she did not

receive equal pay for equal work.  Once she has made her prima

facie case, however, the Equal Pay Act creates a type of strict

liability, shifting the burden of persuasion to ISP to offer a gender-

neutral justification for unequal pay.  <u>Warren v. Solo Cup Co.</u>, 516

F.3d 627, 630 (7th Cir. 2008).

> *1. Lauterbach has raised triable issues of fact in her prima facie*
> *case under the Equal Pay Act.*

To establish a prima facie case under the Equal Pay Act,

Lauterbach must show that (1) higher wages were paid to a male

employee, (2) for equal work requiring substantially similar skill,

effort, and responsibilities, and (3) that the work was performed

under similar working conditions.  <u>Warren</u>, 516 F.3d at 629.  On

the first element, ISP concedes that, at the time of Lauterbach's

retirement in 2012, her monthly salary was $7,590, while her male

colleague Jamie Blakley then earned a monthly salary of $8,335,

and her male colleague David Law had earned a monthly salary of

$8,810 at his retirement in 2009.  The parties advance no

arguments on the third element of similar working conditions, and

so the Court will assume the existence of similar working conditions

for purposes of the present Motion for Summary Judgment.

Rather, the parties focus their energies on the second element,

whether Lauterbach and her higher-earning male colleagues

performed equal work requiring substantially similar skill, effort, and responsibilities.

To demonstrate that she performed equal work, Lauterbach must establish, based upon actual job performance and content—not just job titles, classifications, or descriptions—that the work performed is substantially equal.  Fallon v. State of Ill., 882 F.2d 1206, 1208 (7th Cir. 1989).  The work need not be identical, but it is enough to establish a prima facie case if the duties are "substantially equal."  Id.  And though job descriptions alone cannot be determinative, job descriptions can be highly probative of substantially equal work.  See Epstein v. Sec'y U.S. Dep't of Treasury, 739 F.2d 274, 277 n.6 (7th Cir. 1984) ("[J]ob descriptions may, in some instances, be highly probative of equal work because one would expect that actual responsibilities would, to some extent, conform to a job description.  Similar job descriptions alone, however, do not require a finding of substantial equality of jobs under the Equal Pay Act.").  The crucial finding on the issue of equal work is whether the jobs to be compared have a "common core" of tasks, such that a significant portion of the two jobs is identical.  Fallon, 882 F.2d at 1209.  If a common core is shown,

the question then becomes whether any additional tasks make the jobs substantially different.  Id.  Critically, the issue of whether two jobs require equal skill, effort, and responsibility is a factual determination, suitable for the jury as the trier of fact.  Id. at 1208.

ISP contends that Lauterbach's work was not equal to that performed by her male colleagues, and that her prima facie case is, accordingly, flawed.  ISP asserts that Lauterbach alleges only comparable work, not equal work, to her male colleagues.  ISP points to the fact that Lauterbach and her colleagues Blakley and Law all managed different sections, and that those sections had different responsibilities.  According to ISP, Lauterbach worked on security and disaster recovery.  Blakley maintained the network, mobile data computing, the desktop, server installation, and application development.  Law worked on applications.  ISP also indicates that Lauterbach's male colleagues occupied distinct upper-management positions within ISP:  Blakley, for instance, was an assistant bureau chief nine years before Lauterbach first became an interim assistant bureau chief.  When Lauterbach became an interim assistant bureau chief, Blakley became the bureau chief and Lauterbach's direct supervisor.

Lauterbach counters that she had the same classification, SPSA, and job title, assistant bureau chief, as Blakley did, and that both Lauterbach and Blakley reported to Alan Bugard, at one time the bureau chief and their direct supervisor.  Lauterbach reported directly to Bugard in part because she served as interim assistant bureau chief during a period when no permanent assistant bureau chief was hired.  But while she served as interim assistant bureau chief, Lauterbach did not relinquish her permanent duties as security section manager.  Lauterbach also asserts, though ISP denies, that nearly forty subordinate employees reported directly to her, the same number or more than reported to Blakley.

Lauterbach further argues that the job descriptions for her position and Blakley's position are nearly identical and that, if anything, her job description in fact required more skills.  Cf. 29 C.F.R. § 1620.15(a) (Equal Employment Opportunity Commission regulation providing that, where essentially the same skill is required to perform either of two jobs, the jobs will qualify under the Equal Pay Act as jobs which require equal skill even where one job requires exercise of that skill more frequently).  To the point, Lauterbach cites the portion of her job description providing:

Requires knowledge, skill and mental development equivalent to completion of four years of college. Requires a minimum of four years of progressively responsible professional experience in management information systems environment.  Requires extensive knowledge in the areas of computer hardware, software, communications and applications.

Requires extensive experience managing large complex data processing projects and possess the ability to manage and direct staff in accomplishing organizational goals.  Must be proficient with data processing design methodologies, project management techniques, understand data communication principles, understand the basic elements mainframe and client server computing, process good organizational and communication skills, have the ability to develop an organizational infrastructure to meet departmental demands and assist in establishing strategic planning for the Department, Division, and Bureau.

(Pl.'s Mem. Law Opp. Def.'s Mot. Summ. J., d/e 20, Ex. 7.)

Blakley's job description provides, in part:

Requires knowledge, skill and mental development equivalent to completion of four years of college. Requires a minimum of four years of progressively responsible professional experience in management information systems environment.  Requires extensive knowledge in the areas of computer hardware, software, communications and applications.  Requires thorough knowledge of staff utilization, employee motivation, labor contracts and employee management.

(Id. Ex. 6 (emphasis added).)

Lauterbach also points to the portion of Alan Bugard's deposition in which Bugard identifies Blakley's job responsibilities were "application development" and "management and maintenance."  (Id. Ex. 2, at 16.)  Lauterbach, according to Bugard, was responsible for "infrastructure," "the data center," "the network," devices used in ISP officer vehicles, servers, and security. (Id. at 16–17.)  Bugard further opined that Lauterbach's responsibilities were greater than Blakley's.  Finally, with respect to Law, Lauterbach asserts that she assumed all of his duties upon his retirement at the end of 2009.

Though both Lauterbach and ISP at times resort to arguments concerning little more than job titles, classifications, or descriptions, triable issues of fact remain on this issue of equal work.  Like ISP, who asserts that Lauterbach's male colleagues occupied distinct upper-management positions belying the notion of equal work, Lauterbach insists that Blakley, Law, and her classification as SPSAs and positions as assistant bureau chiefs demonstrate equal work.  But the fact that Lauterbach and her male colleagues managed different sections with different responsibilities, as ISP asserts, is ultimately of no moment.

Lauterbach has shown at least that a common core of tasks exists between her work and that of her male colleagues.  Blakley averred in his deposition that he was responsible for maintaining the ISP network, but Bugard averred that the network was Lauterbach's responsibility.  Similarly, both Lauterbach and Blakley had some responsibility for servers.  Furthermore, both Blakley's and Lauterbach's job descriptions required "progressively responsible professional experience in [the] management information systems environment" and "extensive knowledge in the areas of computer hardware, software, communications and applications."  While not dispositive on the issue of equal work, these identical provisions of the job descriptions, in the context of overlapping responsibilities for computer networks and servers, are at least of probative value on the issue of equal work.

Lauterbach's prima facie case goes further still in her allegations that she supervised as many or more subordinate employees as Blakley and that she assumed Law's duties upon his retirement.  Cf. Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1461 (7th Cir. 1994) (finding sufficient to establish a prima facie case under the Equal Pay Act the allegation that female employee's male

successor received greater salary).  ISP flatly disputes both these

allegations, but construing the facts in the light most favorable to

Lauterbach, these allegations at least present triable issues of fact.

Accordingly, the Court must turn next to determine whether ISP's

defenses to liability under the Equal Pay Act likewise present

genuine issues of material fact suitable for a jury to determine.

### 2. ISP has not carried its burden on summary judgment to establish defenses to Equal Pay Act liability.

Once a plaintiff establishes a prima facie case under the Equal

Pay Act, the burden of proof shifts to the employer to show that the

pay disparity is due to (1) a seniority system; (2) a merit system; (3)

a system which measures earnings by quantity or quality of

production; or (4) any other factor other than gender.  29 U.S.C.

§ 206(d)(1)(i)-(iv); see also Corning Glass Works v. Brennan, 417

U.S. 188, 196 (1974).  "These are affirmative defenses on which the

employer bears the burden of proof (persuasion)."  Fallon, 882 F.2d

at 1211; cf. Celotex Corp., 477 U.S. at 331; Robinson, 23 F.3d at

1162.  Indeed, no proof of discriminatory intent is required under

the Equal Pay Act.  Warren, 516 F.3d at 629; see also Patkus v.

Sangamon-Cass Consortium, 769 F.2d 1251, 1260 n.5 (7th Cir.

1985) ("[T]he Equal Pay Act creates a type of strict liability in that no intent to discriminate need be shown.").  Rather, ISP must prove, and not just assert, that different pay is warranted for Lauterbach due to a nondiscriminatory pay system or other reason.  King v. Acosta Sales & Mktg., Inc., 678 F.3d 470, 474 (7th Cir. 2012) (reversing grant of summary judgment for defendant and remanding Equal Pay Act claim for trial for defendant to "prove, and not just assert," nondiscriminatory reasons for pay disparities between men and women).

ISP asserts that differences in Lauterbach's pay ($7,590 monthly) relative to Blakley ($8,335) and Law ($8,810) are the result of a bona fide merit compensation system governed by the Illinois Personnel Code, 20 ILCS 415/1 et seq., and the Illinois Department of Central Management Services' Personnel Rules and Pay Plan, 80 Ill. Admin. Code §§ 301–05, 310, & 320, et seq. Lauterbach and her male colleagues were all SPSAs, a broad-banded class of non-sworn code employees whose salaries fell within a broad pay range under the merit compensation system; in May 2011, for instance, SPSAs' monthly salaries ranged from $4,295 to $10,500 under the system.  And under the system,

SPSAs' differing salaries are attributable to the merit compensation system's appropriate, nondiscriminatory variables of entrance base pay, movement between salary systems, promotions, salary adjustments, annual merit compensation increases, and bonuses based on annual performance ratings.

According to ISP, in general terms, Lauterbach, Blakley, and Law "had different entrance base salaries, different movements between salary systems, different promotions, and varying annual merit compensation increases and bonuses."  Specifically, Lauterbach began work at ISP in 1979 at a monthly salary of $1,048.  Law began in 1976 at $622 monthly, and Blakley in 1980 at $842.  Blakley also transferred from ISP to other state employment with the Lottery and the Department of Children and Family Services and eventually left for private sector employment in 2004, returning in 2008.  Lauterbach received four promotions over the course of her career; Blakley and Law, on the other hand, received eight promotions each.  Finally, Lauterbach received two salary adjustments for additional responsibilities.  Meanwhile, Law received one salary adjustment for additional responsibilities and one "special" salary adjustment to serve the best interest of the ISP,

and Blakley received just one salary adjustment for additional responsibilities.  According to ISP, these facts show that Lauterbach and her male colleagues were all subject to the merit compensation system and, because the rules of that system applied equally to Lauterbach and her male colleagues, ISP is not liable to Lauterbach under the Equal Pay Act.

ISP's description of its merit compensation system is ultimately, however, question-begging.  Under the Equal Pay Act, the inquiry is not whether any merit pay system <u>exists</u>, but rather whether differences in pay are <u>due</u> to the proper application of that merit pay system.  And the essence of a merit pay system is whether employees subject to that system are paid on the basis of their merit.  ISP finds it sufficient to note that the merit compensation exists and that even Lauterbach agrees it probably applied to her and her male colleagues.  But nowhere does ISP offer any explanation about <u>why</u> Lauterbach's work did not merit the salary increases that would have made her salary comparable to that of her male colleagues, or, conversely, <u>why</u> her male colleagues work did merit their salary increases.  Nor does ISP attempt to justify the greater number of promotions Lauterbach's male

colleagues received on the basis of merit.  (More on these
promotions below.)  Nor does ISP have any merit-based reason to
explain why Lauterbach received salary adjustments for additional
responsibilities and yet still fell short of her male colleagues'
salaries.  Because ISP bears the burden of persuasion on the issue
of a bona fide merit pay system under the Equal Pay Act, ISP's
Motion for Summary Judgment is deficient where it presents no
evidence—let alone credible evidence that would entitle it to a
directed verdict if not controverted at trial.  See Celotex Corp., 477
U.S. at 331; Robinson, 23 F.3d at 1162.

   Moreover, accepting the facts in the light most favorable to
Lauterbach as the nonmoving party, the allegations in this case
present triable issues of fact suitable for jury determination in any
event.  Indeed, Lauterbach has marshaled plenty of evidence in
discovery that, accepted as true, would permit a reasonable jury to
find in her favor.  Specifically, Lauterbach asserts that she
undertook a project in the mid-1990s to rewrite job descriptions for
her subordinate employees after she was told the bureau chief
would consider submitting her for a salary adjustment.  When
Lauterbach completed the job-description project, however, her

salary adjustment was put on hold because a salary adjustment for a male colleague had become a higher priority.[2]  (Def.'s Mem. Summ. J., d/e 15, Ex. 1, at 26.)  Lauterbach describes two other instances of projects for which she received no salary adjustments in 2000 and 2007.  (Id. Ex. 3, at 9.)  More generally, Lauterbach alleges that salary adjustments were given to male colleagues who had less responsibility or who had completed only "minimal projects."  (Id. Ex. 1, at 26.)  And in 2002, Lauterbach claims that she was told that no salary adjustments were being given, but that paperwork was nevertheless submitted for salary adjustments for two of her male colleagues, one of which was granted.  (Id. Ex. 3, at 7.)

Lauterbach further details opportunities she was denied but that were given to her male colleagues that would have resulted in salary increases under the merit compensation system.  For instance, Lauterbach asserts that Blakley was sent to command

---

[2] Though unclear from the record, the Court notes that this incident may be the same incident Lauterbach details in her answer to ISP's interrogatories, in which Lauterbach was told in 1993 that her salary adjustment had been put on hold because another colleague, Steve Miller, should receive a salary adjustment before her.  (Def.'s Mem. Summ. J., d/e 15, Ex. 3, at 7.)

college training to receive credits needed to earn a promotion but, when she requested command college training on at least two occasions, she was turned down because she could not be gone from ISP for three months at a time.  (Id. Ex. 1, at 20.)  At one point after 2007, paperwork was prepared to make Lauterbach an assistant bureau chief, but her "interim" designation was ultimately never removed.  (Id. at 28.)  When she interviewed for the position of assistant bureau chief in 2008, a man was selected for the position instead but, after Lauterbach filed a complaint with Illinois's Office of Equal Employment Opportunity alleging gender and friendship favoritism, the selected man never took the position, and the position remained unfilled.  (Id.)  And finally, even when Lauterbach was given interim titles with additional responsibilities, she was required to retain all her existing duties without salary adjustments, while her male colleagues received salary adjustments for new responsibilities that replaced their existing duties.  (Def.'s Mem. Summ. J., d/e 15, Ex. 3, at 9.)

The Court notes still more facts that undercut the nondiscriminatory application of ISP's merit compensation system to Lauterbach relative to her male colleagues.  To detail just one

example, recall that Lauterbach received four promotions over the course of her career while Blakley received eight during his.  Logs of salary and job classification transactions reveal that Lauterbach began work at ISP in 1979 as a "Programmer I" and needed just three promotions to reach "Programmer IV" in 1985.  (See Docket Entry  of Dec. 8, 2014 (CD-ROM, containing personnel documents, on file with the Court).)  Blakley, by contrast, began work at ISP in 1980 as a "Programmer Trainee" and needed a promotion to reach "Programmer I" in 1981.  (Id.)  Blakley then received another five promotions before he reached "Programmer IV" in 1988.  (Id.)  In short, Lauterbach received just three promotions to reach "Programmer IV;" Blakley received a total of six promotions—two more promotions than Lauterbach received in her entire career with ISP—to reach "Programmer IV."  While a nondiscriminatory reason for these differing career paths may exist under ISP's merit compensation system, the number of promotions, alone, belies ISP's assertion that differences in pay between Lauterbach and Blakley are attributable in part to Lauterbach's four career promotions compared to Blakley's eight.

Whether a nondiscriminatory reason justifies lower pay for Lauterbach than her male colleagues is, in this case, ultimately suitable for a jury to decide. ISP has presented some evidence that Lauterbach received fewer promotions, justifying a lower salary, and numerically more salary adjustments than Blakley or Law, undercutting the suggestion of gender discrimination. But ISP has presented no evidence to show why these decisions, under the merit compensation system, were merit-based. ISP's burden is to prove, not just assert, that Lauterbach's lower pay was nondiscriminatory. See King, 678 F.3d at 474. ISP has not carried this burden with respect to its merit compensation system. Furthermore, ISP has advanced no argument on any other affirmative defense under the Equal Pay Act. See, e.g., 29 U.S.C. § 206(d)(iv) (providing an affirmative defense for differences in pay "based on any other factor other than sex"); Fallon, 882 F.2d at 1211 (describing the exception at § 206(d)(iv) as a "broad, catch-all exception [that] embraces an almost limitless number of factors so long as they do not involve sex"). Lauterbach, on the other hand, has presented enough of her own evidence to highlight genuine issues of material fact as to whether ISP applied the merit compensation system in a

nondiscriminatory fashion.  Therefore, ISP has not carried its

burden of persuasion on summary judgment on Lauterbach's claim

under the Equal Pay Act.

**B.     Lauterbach's prima facie case and burden of persuasion to show gender discrimination under Title VII present genuine issues of material fact, suitable for a jury to determine.**

In Count 2 of her Complaint, Lauterbach alleges that ISP

discriminated against her on the basis of gender under Title VII of

the Civil Rights Act of 1964.  Title VII prohibits employers from

discriminating against their employees based on "race, color,

religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

Lauterbach's Title VII claim is based on the same allegations of

unequal pay for equal work as is her Equal Pay Act claim.  And

indeed Title VII and the Equal Pay Act cover the same sort of

substantive legal harm, discriminatory pay.  See Fallon, 882 F.2d at

1213 n.6 ("Obviously, though, there is a good deal of overlap

between the two acts.").  But unlike the Equal Pay Act, which shifts

the burden of persuasion to defendants to prove an affirmative

defense to gender-based pay discrimination, the plaintiff in most

Title VII claims bears the burden of persuasion at all times.  See,

e.g., id. ("The risk of nonpersuasion . . . is always (except for a few exceptions) on a Title VII plaintiff.").

The differences of burden distribution between the Equal Pay Act and Title VII lead to different legal standards to be applied on summary judgment, if not necessarily to different outcomes on the claims.  To escape liability to Lauterbach under the Equal Pay Act, ISP must demonstrate that its merit compensation system, not gender discrimination, determined Lauterbach's pay by a showing of credible evidence that would entitle it to a directed verdict if not controverted at trial.  Celotex Corp., 477 U.S. at 331; Robinson, 23 F.3d at 1162.  For the Title VII claim, however, ISP needs only to show an absence of evidence to support Lauterbach's claim of gender discrimination in pay, while Lauterbach's burden on summary judgment is to produce some evidence that a jury could find in her favor.  Modrowski, 712 F.3d at 1168–69; cf. Fallon, 882 F.2d at 1213 (discussing differences in burdens of proof between Equal Pay Act and Title VII and vacating grant of summary judgment in plaintiff's favor for, in part, failing to observe these differences).

To establish her claim under Title VII, Lauterbach may proceed under either a direct or an indirect method to prove unlawful discrimination.  Lauterbach has chosen the indirect method.[3]  Under the indirect method, as first established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), Lauterbach must first successfully state a prima facie case of gender discrimination in pay.  <u>See also, e.g.</u>, <u>Coleman v. Donahoe</u>, 667 F.3d 835, 845 (7th Cir. 2012) (applying the <u>McDonnell Douglas</u> framework).  If she states a prima facie case, ISP then has a burden of production to articulate a legitimate, nondiscriminatory reason for her unequal pay.  <u>Id.</u>  If ISP meets its burden of production, Lauterbach must finally prove that ISP's proffered reason is a pretext for discrimination.  <u>Id.</u>  On summary judgment, each of these steps obliges Lauterbach to identify evidence from the record that establishes genuine issues of material

---

[3] And probably wisely so.  The direct method of proof of a Title VII claim presents a high hurdle for plaintiffs, requiring evidence which, if believed by the trier of fact, would prove that ISP intentionally discriminated against Lauterbach because she is a woman without reliance upon inference or presumption.  <u>See</u> <u>Eiland v. Trinity Hosp.</u>, 150 F.3d 747, 751 (7th Cir. 1998).  No such direct evidence is apparent on the record before the Court.

fact suitable for determination by a jury.  Modrowski, 712 F.3d at 1169.

### 1. Lauterbach has raised triable issues of fact in her prima facie case under Title VII.

To establish a prima facie case under the indirect method of Title VII, Lauterbach must offer evidence that (1) she is a member of a protected class; (2) her job performance met ISP's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated individual who was not in the protected class was treated more favorably than she was.  Coleman, 667 F.3d at 845.  ISP appears to concede the first three elements of Lauterbach's prima facie case, focusing its briefing exclusively on whether Lauterbach was similarly situated to her male colleagues who were paid more.

Employees are similarly situated where they are directly comparable to one another in all material respects.  Brummet v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005). Salient factors in the determination that employees are similarly situated often include whether the employees held the same job description, were subject to the same standards, were subordinate

to the same supervisor, and had comparable experience, education, and other qualifications.  Id. at 692–93.  The similarly-situated inquiry is a common-sense one:  Two employees must share enough common features to allow a meaningful comparison.  Humphries v. CBOCS W., Inc., 474 F.3d 387, 405 (7th Cir. 2007).  "[T]hey need not be identical in every conceivable way."  Coleman, 667 F.3d at 846.  Indeed, the Supreme Court has cautioned that "precise equivalence . . . between employees is not the ultimate question." McDonald v. Santa Fe. Trail Transp. Co., 427 U.S. 273, 283 n.11 (1976).  The goal is to identify an employee–comparator, not a "clone."  Chaney v. Plainfield Healthcare Ctr., 612 F.3d 908, 916 (7th Cir. 2010).  Critically, the determination whether employees are similarly situated—like the determination of equal work under the Equal Pay Act—is "usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." Coleman, 667 F.3d at 846–47 (citations omitted).

ISP contends that Lauterbach and her male colleagues Blakley and Law were not similarly situated employees because they managed different sections with different responsibilities:

Lauterbach worked on security and disaster recovery; Blakley maintained the network, mobile data computing, the desktop, server installation, and application development; Law worked on applications.  ISP also points out that Lauterbach and her male colleagues "were at times [each other's] supervisors" and that Lauterbach's male colleagues occupied distinct upper-level management positions.  (Def.'s Mem. Summ. J., d/e 15, at 21–22.) Finally, ISP asserts that Blakley was an assistant bureau chief nine years before Lauterbach first became an interim assistant bureau chief.

Lauterbach counters, as she did to establish her prima facie case under the Equal Pay Act, that she and her male colleagues held the same job classification of SPSA, the same job title of (interim) assistant bureau chief, the same supervisor when both she and Blakley reported to bureau chief Alan Bugard, the same level of responsibility, and roughly the same number of subordinate employees.  The Court also notes the similarities in the job descriptions for Lauterbach and Blakley, as previously discussed in the analysis of Lauterbach's Equal Pay Act claim.  And as previously discussed, the Court further recognizes the issues of

material fact concerning Lauterbach's and Blakley's respective responsibilities for ISP's network and servers, as well as whether Lauterbach took over Law's duties upon his retirement.

Arguably, if Lauterbach has satisfied her burden at summary judgment with respect to her prima facie case under the Equal Pay Act, she has perforce satisfied the same prima facie burden under Title VII.  Under the Equal Pay Act, the plaintiff's prima facie case must ultimately show that an employer paid different wages to employees of opposite sexes for <u>equal</u> work in jobs requiring <u>equal</u> skill, effort, and responsibility under similar working conditions. Title VII, by contrast, a prima facie case requires only that the plaintiff, a member of a protected class, received adverse treatment compared to nonmembers of the class who had <u>similar</u> jobs. "Under the disparate treatment model of a Title VII action, there is a relaxed standard of similarity between male- and female-occupied jobs, but a plaintiff has the ultimate burden of proving an intent to discriminate on the basis of sex."  <u>Brinkley-Obu v. Hughes Training, Inc.</u>, 36 F.3d 336, 343 & n.14 (4th Cir. 1994) (citations omitted) (noting in footnote that in <u>County of Washington v. Gunther</u>, 452 U.S. 161 (1981), the Supreme Court "determined that failure to

prove the equal work standard of the Equal Pay Act did not bar a plaintiff's cause of action under Title VII for discrimination in compensation.").

In light of the issues of material fact Lauterbach has raised and the substantial similarities evinced in job classification, job title, job description, supervisor, and supervisory responsibilities, Lauterbach has marshaled enough evidence for a reasonable fact-finder to conclude that she has carried her burden to establish a prima facie case under Title VII.  See Coleman, 667 F.3d at 846–47. The Court must, therefore, turn next to the issue of ISP's legitimate and nondiscriminatory reasons for Lauterbach's lower pay and Lauterbach's enduring burden of persuasion to show that ISP's articulated reasons are pretextual.

> ### 2. Lauterbach has raised triable issues of fact on the issue of whether ISP's merit compensation system is pretextual.

As discussed earlier, ISP asserts that its merit compensation system, governed by the Illinois Personnel Code and the Illinois Department of Central Management Services' Personnel Rules and Pay Plan, is a bona fide merit pay system.  Lauterbach, moreover, does not dispute that ISP's merit compensation system discharges

its burden of production under <u>McDonnell Douglas</u>.  Lauterbach
does dispute, however, that the merit compensation system was
applied to her in a nondiscriminatory way.  Rather, she alleges, and
it is ultimately her burden to prove, that the merit compensation
system was merely pretext to pay her less than her male colleagues.

Pretext means "a lie, specifically a phony reason for some
action."  <u>Russell v. Acme-Evans Co.</u>, 51 F.3d 64, 68 (7th Cir. 1995).
A phony reason does "not require that plausible facts presented by
the defendant not be true, but only that they not be the reason for
the employment decision."  <u>Hasham v. Cal. State Bd. of
Equalization</u>, 200 F.3d 1035, 1045 (7th Cir. 2000).  "The question is
not whether the employer's stated reason was inaccurate or unfair,
but whether the employer honestly believed the reasons it has
offered to explain" its action.  <u>Coleman</u>, 667 F.3d at 852.  Even
"circumstantial evidence can be offered to prove that Defendant's
purported reasons for the promotion decision are not worthy of
belief and thus pretextual."  <u>Hasham</u>, 200 F.3d at 1045.

To meet her burden to show pretext on summary judgment,
Lauterbach must "identify such weaknesses, implausibilities,
inconsistencies, or contradictions" in ISP's asserted reason "that a

reasonable person could find [the reason] unworthy of credence."
Coleman, 667 F.3d at 852.  One permissible form of pretext
evidence is the very fact that similarly-situated colleagues outside
Lauterbach's protected class received more favorable treatment.
See id. at 857–58 ("Our precedents also teach that the similarly-
situated inquiry and the pretext inquiry are not hermetically sealed
off from one another.  We have often noted that the prima facie case
and pretext analysis often overlap.").  As discussed in the context of
the Title VII prima facie case, Lauterbach has at least raised jury
questions as to whether similarly-situated male colleagues were
paid more under the merit compensation system than she was.

      And, as discussed in the context of ISP's defenses to Equal Pay
Act liability, Lauterbach has identified still other weaknesses in
ISP's assertion that her lower pay was justified under the merit
compensation system.  Lauterbach alleges that she did not receive
salary adjustments for additional responsibilities when she
deserved them on three occasions in the mid-1990s, 2000, and
2007.  (Def.'s Mem. Summ. J., d/e 15, Ex. 1, at 26; id. Ex. 3, at 9.)
Meanwhile, her male colleagues did receive such salary
adjustments ahead of her when merited, as well as at times when

their merit was more questionable.  (Id. Ex. 1, at 26.)  Furthermore,

in 2002, Lauterbach alleges that she was told that no salary

adjustments were available and yet paperwork was submitted for

two of her male colleagues to receive salary adjustments, one of

which was approved.  (Id. Ex. 3, at 7.)  Lauterbach also alleges that

she was denied opportunities given to her male colleagues that

would have given her a chance for pay increases under the merit

compensation system, such as command college training.  (Id. Ex.

1, at 20.)  Paperwork was not completed to remove her interim

status as assistant bureau chief, and when the man selected

instead of her to fill the position would no longer take it, the

position simply went unfilled rather than go to Lauterbach.  (Id. at

28.)  And as the Court noted, the difference in pay between

Lauterbach and Blakley is hard to understand with reference to

their respective promotions when Blakley required six promotions

to reach the same job title Lauterbach held after only three.

     In sum, the evidence Lauterbach has presented would permit

a rational jury to find in her favor on the issue of pretext.  Because

she has presented sufficient evidence to create genuine issues of

material fact, her Title VII claim must also be presented to a jury, and summary judgment must be denied.

### IV.   CONCLUSION

Each of the steps in determining ISP's liability to Lauterbach under both the Equal Pay Act and Title VII present genuine issues of material fact, suitable for a jury to determine.  For this reason, the Motion for Summary Judgment (d/e 14) is DENIED.

IT IS SO ORDERED.

ENTER:  July 28, 2015

FOR THE COURT:                    s/ Sue E. Myerscough
                                  SUE E. MYERSCOUGH
                            UNITED STATES DISTRICT JUDGE